# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

_____

| | |
|---|---|
| **In Re** | |
| KENT T. NAKAMURA and WENDY LEE NAKAMURA, | **Bankruptcy Case No. 06-40685-JDP** |
| **Debtors.** | |

_____

| | |
|---|---|
| R. SAM HOPKINS, Trustee, | |
| **Plaintiff,** | |
| vs. | **Adv. Proceeding No. 07-8059** |
| COUNTRYWIDE HOME LOANS, INC., | |
| **Defendant.** | |

_____

## MEMORANDUM OF DECISION
_____

**Appearances:**

Jim Spinner, SERVICE, SPINNER & GRAY, Pocatello, Idaho, Attorneys for Plaintiff.

Richard W. Mollerup, MEULEMAN MOLLERUP, Boise, Idaho, Attorneys for Defendant.

MEMORANDUM OF DECISION - 1

*Introduction*

In this adversary proceeding, Plaintiff, chapter 7[1] trustee R. Sam Hopkins, and Defendant, Countrywide Home Loans, Inc., filed a Stipulation to Submit Case on Stipulated Facts, Oral Argument and Written Memorandum.  Docket No. 8.  As a result, the trial date was vacated, the parties stipulated to the relevant facts in lieu of trial, and filed briefs.  Docket Nos. 9, 10, 13, 14.  The Court heard oral argument by the parties on December 19, 2007, and took the issues under advisement.  Docket No. 15.  After due consideration of the submissions of the parties, the arguments of counsel, as well as the applicable law, this Memorandum constitutes the Court's findings of fact and conclusions of law, and resolves the issues.  Rule 7052.

*Facts*

On March 8, 2005, chapter 7 debtor Kent Nakamura signed a real

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001– 9037.

MEMORANDUM OF DECISION - 2

estate purchase and sale agreement to purchase a home located in Blackfoot, Idaho (the "Property"). Ex. 1. Debtor Wendy Nakamura did not sign the purchase and sale agreement. *Id*.

In order to obtain financing to purchase the Property, Kent[2] applied for and received a loan from America's Wholesale Lender. Stipulated Facts and Evidence ("Stip.") ¶ 5. All negotiations and communications regarding the financing were done via facsimile and letter correspondence. Debtors attended a closing of the loan transaction at Alliance Title Company, the closing agent, in Blackfoot, Idaho. Stip. at ¶ 5; Deposition of Kent T. Nakamura ("Kent Nakamura Depo.") pp. 30-32; Deposition of Wendy Lee Nakamura ("Wendy Nakamura Depo.") p. 14.

Defendant, also a home mortgage lender, is the successor in interest to America's Wholesale Lender as to the Nakamura loan. Stip. at ¶ 3.

Kent financed 100 percent of the purchase price of the Property through two promissory notes. One loan, secured by a first priority trust

---

[2] The Nakamuras are collectively referred to herein as "Debtors," and individually by their first names. No disrespect is intended.

MEMORANDUM OF DECISION - 3

deed, advanced 80 percent of the value of the Property. The other, secured by a second priority deed of trust, advanced 20 percent of the value. Stip. at ¶ 6. All loan proceeds were applied to payment of the purchase price. *Id*.

All the financial information utilized in applying for, underwriting the notes, and obtaining the loan related to Kent only; Wendy's financial information was not used. Ex. 2; Ex. 5; Stip. at ¶ 7; Kent Nakamura Depo. pp. 7-9; 16. This approach resulted from a tactical decision on Debtors' part, because Kent had much better credit than Wendy, and Wendy was a student at the time. Stip. at ¶ 9; Kent Nakamura Depo. at 8.

Kent and Wendy were married in 1978, but had divorced in 1982. Stip. at ¶ 10; Kent Nakamura Depo. at 5-6. In 1983, they reconciled and began living together again; they have done so ever since. Stip. at ¶ 11; Kent Nakamura Depo. at 6. Debtors kept their finances separate, and held no joint bank or other accounts. Kent Nakamura Depo. at 9-10, 16. However, since getting back together in 1983, Wendy has given money to Kent to help in the payment of bills and debts incurred by them, including

MEMORANDUM OF DECISION - 4

the payments on the loans used to purchase the Property. Stip. at ¶ 11;

Kent Nakamura Depo. at 22-24; Wendy Nakamura Depo. at 15-17.

After reconciling in 1983, Debtors did not hold themselves out as

being married, but in about 1998, began to do so to their youngest child's

friends when she began school. Stip. at ¶ 12.

The deeds of trust executed on March 24, 2005 list Kent as an

unmarried person. Ex. 3, 7. Debtors do not recall being asked about their

marital status during the loan application process; Kent specifically does

not remember being referred to as single in the loan documents, and just

signed them as they were presented to him during the closing. Stip. at ¶

14; Kent Nakamura Depo. at 10, 12-13.

Debtors filed a joint chapter 7 petition on December 6, 2006. BK

Docket No. 1; Ex. 10. On Schedule C, they claimed the Property exempt as

a homestead in the amount of $17,098.27,[3] and indicated that they were

both claiming the exemption. Ex. 10. On Schedule D, they listed

---

[3] Presumably, this figure represents the difference between what Debtors estimate the value of the Property to be, $145,000, and the total they estimate to be due on the two mortgages, $127,901.73.

MEMORANDUM OF DECISION - 5

Defendant as a secured creditor holding first and second mortgages on the Property, and listed those debts as "joint or community" debts. *Id*. They further listed their marital status on Schedule I as "Common-Law". *Id*.

Plaintiff, the appointed trustee in Debtors' bankruptcy case, commenced this adversary proceeding against Defendant, as the holder of the trust deeds, on May 11, 2007.

On May 29, 2007, Debtors recorded a declaration of non-abandonment of homestead. Stip. at ¶ 16; Ex. 11. In it, Debtors represent they are married. *Id*.

### *Disposition of Issues*

As trustee, Plaintiff seeks to avoid Defendant's liens on the Property under § 544(a) alleging that the deeds of trust were not properly executed and perfected. Plaintiff argues that because both deeds of trust were signed only by Kent Nakamura, and not by his spouse, and because the Property is Debtors' community homestead, the requirements of Idaho Code §§ 55-1007 and 32-912 have been violated. Those statutes require the acknowledgment of both husband and wife on any instrument intended to

MEMORANDUM OF DECISION - 6

convey or encumber the community homestead.[4] According to Plaintiff, the failure to obtain Wendy's signature on the deeds of trust and to "resolve her community interest and homestead interest" in the Property, means those trust deeds were not properly executed, and are therefore subject to avoidance under § 544(a).

Pursuant to § 544(a)(3), Plaintiff occupies the status of a hypothetical bona fide purchaser of real property from the debtor as of the date of the filing of the bankruptcy petition.[5] Section 544(a)(3) "allows the avoidance

---

[4] Idaho Code § 55-1007 requires that both husband and wife sign any instrument to convey or encumber the community homestead, while § 32-912 requires both spouse's signatures to convey or encumber any community real property.

[5] Section 544(a) provides that:

> The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by –
> . . . .
> (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser at the time of the

MEMORANDUM OF DECISION - 7

of any transfer of real property that is not perfected and enforceable under applicable law against a bona fide purchaser from the debtor as of the instant the bankruptcy petition is filed." *Young v. Washington Fed. Sav. & Loan Assoc. (In re Young)*, 93 I.B.C.R. 190, 191 (Bankr. D. Idaho 1993) *aff'd* 94 I.B.C.R. 201 (D. Idaho 1994).

> As a practical matter, § 544(a)(3)
>
>> allows that [sic] avoidance of any transfer of real property not properly perfected prior to the filing of the bankruptcy petition if a bona fide purchaser exists. The perfection of the transfer is determined by applying the "applicable law". "Applicable law" has been held to mean the applicable state law. *In re Maidwell*, 90 I.B.C.R. 322, 323. Therefore, while § 544(a)(3) creates a hypothetical bona fide purchaser, the Idaho law interpreting relevant Idaho perfection statutes for real property will define or limit the rights of the hypothetical bona fide purchaser.

*In re Young*, 94 I.B.C.R. at 203.

The heart of Plaintiff's argument is that if the conveyance or

---

commencement of the case, whether or not such a purchaser exists [and has perfected such transfer]. (Bracketed material in original).

MEMORANDUM OF DECISION - 8

encumbrance was unlawful from its inception, then the lien secured by the deeds of trust was also flawed and incapable of perfection.  As such, employing § 544(a)(3), Plaintiff contends that his rights as a hypothetical bona fide purchaser of the property would be superior to those of Defendant under state law.  This is because, in Idaho, it has long been held that "an instrument purporting to convey or incumber [sic] community property occupied as a residence, or any interest therein, in which the wife does not join, is void, . . ." *Knudsen v. Lythman*, 200 P. 130, 131-32 (Idaho 1920) (citing *Myers v. Eby*, 193 Pac. 77, 79 (Idaho 1920) ("an acknowledgment by the wife, as provided by law, was essential to the validity of the mortgage.")).  Therefore, if Debtors were in fact married under the common law, then both of their signatures would be required on the deeds of trust executed on the homestead.

In order to determine whether the joint signature requirements of Idaho Code §§ 55-1007 and 32-912 applied to Defendant's mortgages, the Court must decide whether the Property was the Debtors' community property.   And since Debtors were divorced in 1982, in order for the

MEMORANDUM OF DECISION - 9

Property to be their community property when the trust deeds were executed, Plaintiff must establish that Debtors were "remarried" under the common law. On the basis of the record submitted by the parties, the Court concludes Plaintiff has not proven Debtors had entered into a common law marriage.

In 1995, the Idaho legislature revised its statutes to prohibit the legal recognition of common law marriages. Idaho Code § 32-201, enacted that year, provides:

> (1) Marriage is a personal relation arising out of a civil contract between a man and a woman, to which the consent of parties capable of making it is necessary. Consent alone will not constitute marriage; it must be followed by the issuance of a license and a solemnization as authorized and provided by law. Marriage created by a mutual assumption of marital rights, duties or obligations shall not be recognized as a lawful marriage.
> (2) The provisions of subsection (1) of this section requiring the issuance of a license and a solemnization shall not invalidate any marriage contract in effect prior to January 1, 1996, created by consenting parties through a mutual assumption of marital rights, duties or obligations.

MEMORANDUM OF DECISION - 10

Idaho Code § 32-201.

Under this statute, because Debtors' solemnized marriage was legally terminated in 1982, to be valid, Debtors' purported common law marriage must have been established between 1983, when they renewed their relationship after the divorce, and 1996, when the statute prohibiting common law marriages went into effect. If a valid common law marriage was established during this time frame, it continued to be valid even after the legislature acted to prohibit such relationships.

In this analysis, we are guided by the Idaho Supreme Court, which has held:

> In order to demonstrate the existence of a common law marriage, the evidence must show that the parties were both capable of giving consent, and did in fact consent, to the common law marriage at its inception. *Hall v. Becker (In re Wagner)*, 893 P.2d 211, 214 (Idaho 1995). The parties must assume the rights, duties and obligations of marriage. *Id*. The parties' consent may be either expressed or implied by their conduct. *Id*. If consent is implied, the best and most common, although not exclusive, method of proving consent is to show cohabitation, general reputation in the community as husband and

MEMORANDUM OF DECISION - 11

> wife, and holding oneself out as married. *Id.*; *Metropolitan Life Ins. Co. v. Johnson*, 645 P.2d 356, 361 (Idaho 1982). From such evidence, the court may infer that, at the outset, mutual consent was present. *Id*. . . . Once the parties to the alleged common law marriage establish a prima facie case by a preponderance of the evidence, a presumption of marriage exists, which must be overcome by the opposing party with clear and convincing evidence. *In re Wagner*, 893 P.2d at 214; *Metropolitan Life*, 645 P.2d at 361. Once parties agree or consent to marry and consummate the marriage by mutual assumption of marital duties and obligations, their subsequent actions cannot defeat the marriage, because there is no common law divorce. *Id.* at 362.

*Wilkins v. Wilkins*, 48 P.3d 644, 649 (Idaho 2002).

Thus, there are two general requirements to show the existence of a valid common law marriage. First, there must be consent by the parties to enter into a contract of marriage, given at the time of contracting, and second, there must be the mutual assumption of marital rights, duties and obligations. *Matter of Estate of Wagner*, 893 P.2d 211, 214 (Idaho 1995) (citing *Metropolitan Life, supra,* 645 P.2d at 361; *Hamby v. J.R. Simplot Co.*, 498 P.2d 1267, 1269 (Idaho 1972)).

MEMORANDUM OF DECISION - 12

Given this legal framework, Plaintiff, as trustee, seeks to prove that Debtors had lawfully married under the common law such that they were required to jointly execute any deeds of trust on their homestead to secure the loans to Defendant's predecessor in interest. If Plaintiff establishes a prima facie case by a preponderance of the evidence, a presumption of marriage then exists, which Defendant may only rebut with clear and convincing evidence.

The case law makes clear that the best evidence of the parties' intent is a written instrument, signed by both parties, confirming their desire to establish a common law marriage. *Metropolitan Life*, 645 P.2d at 361; *McCoy v. McCoy*, 868 P.2d 527, 530 (Idaho Ct. App. 1994). "In the absence of a writing, the next best evidence would be the testimony of both parties to the asserted marriage . . . ." *Metropolitan Life*, 645 P.2d at 361; *McCoy*, 868 P.2d at 530.

Here, the Court is fortunate to have access to the deposition testimony of both Kent and Wendy. The difficulty with Plaintiff's position is the attitude of Debtors themselves toward marriage. Each testified that,

MEMORANDUM OF DECISION - 13

essentially for the first 15 years after reconciling, although they lived together, they did not consider themselves to be married, nor did they hold themselves out as a married couple. Kent Nakamura Depo. at 21; Wendy Nakamura Depo. at 5. Indeed, when the question was asked about whether they had ever been issued a marriage license after their divorce, both parties answered "No" and Wendy added, "Nor will we ever have one." Kent Nakamura Depo. at 7. Furthermore, Kent was asked by Plaintiff's counsel whether, after he and Wendy got back together in 1983, they held themselves out as husband and wife, and Kent replied, "No," and went on to testify that "we pretty much just go our separate ways and do our own thing." Kent Nakamura Depo. at 21-22.

Rather than evincing any desire to form a common law marriage, it appears that in order to ensure things would "look right" to their daughter's friends, they began to hold themselves out as husband and wife in 1998, some 15 years after they began cohabitating. The following testimony is illustrative:

Q. Well, I think what I'm asking you is at one point in

MEMORANDUM OF DECISION - 14

> time, I mean, did you ever – when you got back together in 1983, how you represented yourself to people. Did you represent yourself as "I'm a single guy," or did you represent yourself that "I'm a married guy"?
>
> A. Yeah, we pretty much represented ourselves as being divorced but living together.
>
> Q. Okay. And when did that change?
>
> A. I can't tell you exactly when, but I'm going to – like I say, it pretty much has to do with our youngest daughter and how her friends perceived us to be, to kind of make it look right for her.
>
> Q. Okay. And she was born in 1991?
>
> A. Right.
>
> Q. So sometime –
>
> A. It was sometime after that.
>
> Q. Okay. But you don't have a real definite date?
>
> A. (Witness shook head.)

Kent Nakamura Depo. at 39-40. The testimony was clarified during the deposition of Wendy Nakamura. She testified:

> Q. Okay. From your perspective, did you hold yourself out to the public as husband and wife after you got back together in 1983?
>
> A. Not really. We – I used to say we were just cohabitating.
>
> Q. Okay. When you introduced yourself to people – I mean when I introduce myself to somebody, I say, "My name's Dick. This is my wife." How did you introduce yourselves?
>
> A. Friends or partners.
>
> Q. Okay. And did that continue up until the present time,

MEMORANDUM OF DECISION - 15

> or did that change at any point in time?
> A. It changed probably about when Brittany was old enough to start going to school. So probably 19 – let's see. She was born in '91. She started school when she was in first. Seven years old. So probably then it was more we'd introduce ourselves more as husband and wife, and it was mostly to protect her with her friends.

Wendy Lee Nakamura Depo. at 5. And later,

> Q. Okay. Just to recap your testimony, you did not start holding yourself out as husband and wife until probably around 1998?
> A. Correct.

Wendy Lee Nakamura Depo. at 9; *see also* at 10.

While there is evidence that Debtors began to hold themselves out to others as being married beginning in 1998, there is simply no evidence that Debtors ever intended to consent to be married prior to 1996, when common law marriage was made illegal.[6] Idaho case law makes clear that

---

[6] Plaintiff relies upon Debtors' testimony at the § 341 hearing that they had been married for 29 years as proof of the establishment of a common law marriage. However, the depositions make clear that by that time, Debtors were holding themselves out as husband and wife – for the benefit of their daughter's reputation – and also that they had been misinformed by their attorney that although common law marriage had been outlawed, they had been "grandfathered in" because they had been living together. Wendy Lee Nakamura Depo. at 6-7. In evaluating their intent, the Court finds Debtors'

MEMORANDUM OF DECISION - 16

evidence of cohabitation alone, even over an extended period of time, is insufficient to establish a common law marriage. *See Wilkins*, 48 P.3d 644 (individuals found not to have common law marriage after cohabitating for 14 years). Plaintiff has therefore failed to prove Debtors intended to establish a common law marriage prior to the time legal recognition of such a relationship was precluded.

Moreover, even had Plaintiff established that Debtors intended to enter into a common law marriage prior to 1996, there is a second requirement for the validation of that relationship to consider under the case law: whether Debtors mutually assumed marital rights, duties and obligations. On this critical point, there was no evidence in the record concerning Debtors' day-to-day arrangements within the household, nor were any tax or other significant financial records presented to the Court to show Debtors conducted their affairs as though married.

What Debtors' testimony did clearly establish is that although

---

deposition testimony concerning the nature of their relationship and attitudes toward marriage to be much more enlightening.

MEMORANDUM OF DECISION - 17

Debtors lived together and shared in paying the household bills, they had no joint bank or credit accounts. Wendy generally operated on a cash basis, and would take money from her paycheck and give it to Kent to aid in paying the household bills; this activity comes as close to evidence that Debtors commingled their funds as the Court can find in the record. This evidence is insufficient to show Debtors undertook the financial obligations and attributes of a married couple. Indeed, when the testimony is fairly construed, it seems that, financially speaking, Wendy was more akin to Kent's roommate than his spouse.

## *Conclusion*

Plaintiff has not satisfied his burden to prove, by a preponderance of the evidence, that Debtors engaged in a common law marriage. Unless it can be shown that Debtors were married, there is no evidence that Wendy held any interest in the Property, and thus there was no legal requirement that she join in executing the deeds of trust securing the mortgages on the home pursuant to Idaho Code §§ 39-912 and 55-1007 as Plaintiff contends.

MEMORANDUM OF DECISION - 18

This action shall be dismissed by separate judgment.[7]

Dated: January 22, 2008

*(signature)*

Honorable Jim D. Pappas
United States Bankruptcy Judge

---

[7] While the Court has concluded, on the basis of the record presented, that Plaintiff did not prove that Debtors entered into a common law marriage prior to 1996 when the Idaho legislature prohibited such relationships, the Court expresses no opinion concerning the implications of its decision with regard to Debtors' entitlement, in December 2006, to file a joint bankruptcy petition. *See* § 302 (mandating that such a petition may be filed by "an individual that may be a debtor . . . and such individual's spouse"). The Court further expresses no opinion as to the affect of its decision on any of Debtors' other representations, made both in their bankruptcy schedules and elsewhere, that they were and are "married."

MEMORANDUM OF DECISION - 19